J-A11037-23
J-A11038-23
J-A11039-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| TREVONN HANCOCK | : | No. 1158 WDA 2022 |

Appeal from the Suppression Order Entered September 2, 2022
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0001280-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| ROMEO M. TREXLER | : | No. 1159 WDA 2022 |

Appeal from the Suppression Order Entered September 2, 2022
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0001117-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| AARON JAMES FINDLEY | : | No. 1160 WDA 2022 |

Appeal from the Suppression Order Entered September 2, 2022
In the Court of Common Pleas of Cambria County Criminal Division at
No(s): CP-11-CR-0001119-2021

J-A11037-23
J-A11038-23
J-A11039-23

BEFORE:   BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED:  June 9, 2023**

The Commonwealth of Pennsylvania appeals from the September 2, 2022 order of the Court of Common Pleas of Cambria County (trial court) granting the motions to suppress filed by Trevonn Hancock (Hancock), Romeo M. Trexler (Trexler) and Aaron James Findley (Findley) (collectively, the Defendants).[1]  We reverse and remand for further proceedings.

## I.

Following a traffic stop during which two firearms were recovered, the Defendants were each charged with two counts of persons not to possess a firearm and two counts of carrying a firearm without a license.[2]  Hancock was additionally charged with one count of tampering with evidence and Findley was charged with three counts of drug-related driving under the influence (DUI).[3]  The Defendants filed motions to suppress the evidence gleaned from the vehicle stop, arguing that they had a reasonable expectation of privacy in the vehicle and were subjected to a prolonged illegal detention for a minor

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Because the Commonwealth has raised the same issues in each appeal, we have consolidated these cases *sua sponte*.  Pa. R.A.P. 513.

[2] 18 Pa.C.S. §§ 6105(a)(1) & 6106(a)(1).

[3] 18 Pa.C.S. §§ 4910(2), 3802(D)(1)(i), 3802(D)(1)(iii) & 3802(D)(2).

vehicle violation. They contended that no valid probable cause, exigent circumstances, consent or search warrant rendered the search constitutional. The trial court aptly summarized the facts adduced at the suppression hearing:

> On or about August 16, 2021, Officer Dalton K. Geisel of the East Conemaugh Borough Police Department performed a traffic stop of a silver Jeep operating without illuminated headlights on Second Street in East Conemaugh Borough. Officer Geisel approached the subject vehicle and spoke with the driver, later identified as Defendant Findley, and requested his driver's license, registration, and proof of insurance. Defendant Findley provided a driver's license, but failed to provide valid registration or insurance for the vehicle. Notably, Officer Geisel later reported that he detected some signs that Defendant Findley may have been intoxicated while operating the vehicle, including "bloodshot and glassy eyes." Officer Geisel also asked the three passengers in the vehicle to provide identification. None of the passengers provided physical identification, but a Mr. Jashon Gordon identified himself accurately and Defendant Hancock claimed that his name was "Marquis/Marcus Phillips."
>
> Shortly after the traffic stop began, Defendant Trexler's mother, Jacqueline Trexler, arrived on scene and provided Officer Geisel and Detective Deffenbaugh of the East Taylor Police Department, who had arrived shortly before, with the vehicle's insurance information. Officer Geisel, based on signs which he detected at the onset of the stop, believed that the driver, Defendant Findley, might be operating the vehicle under the influence. Officer Geisel removed Defendant Findley from the vehicle, performed a **Terry**[4] frisk, and then handcuffed him and ordered him to sit on the nearby sidewalk. Officer Geisel also requested that the passengers exit the vehicle and performed **Terry** frisks of each of them, then handcuffed them and ordered them to sit on the sidewalk. Officer Geisel looked into the vehicle through one of the open doors and then asked Ms. Trexler several times for her consent to search it. Ms. Trexler, as the registered owner of the vehicle, provided Officer Geisel with verbal consent for him to

---

[4] **Terry v. Ohio**, 391 U.S. 1 (1968).

- 3 -

perform a search of the car's interior. Officer Geisel retrieved a loaded AK-47 from the backside passenger seat behind the driver that was covered by a jacket. Officer Geisel also found a loaded Taurus 9-millimeter in the trunk of the vehicle, which was accessible from the passenger compartment.

Officer Geisel then performed field sobriety tests for Defendant Findley, but did not detect any additional signs of impairment. Detective Deffenbaugh then transported Defendant Findley to Conemaugh Hospital for a blood alcohol content (BAC) test while Ms. Trexler was permitted to retake custody of the vehicle. Before releasing the vehicle to Ms. Trexler, Officer Geisel secured the aforementioned weapons and also discovered a THC packet, leading him to suspect that one or more of the vehicle's occupants had been under the influence of THC at the time of the stop. This was confirmed by the BAC test performed on Defendant Findley, which showed traces of Delta-9 and Carboxy THC in his system.

Opinion and Order, 9/2/22, at 1-3. The traffic stop was recorded on Officer Geisel's body camera and the footage was introduced as an exhibit at the suppression hearing. The Commonwealth also submitted the transcript of the joint preliminary hearing for Findley, Gordon and Trexler; the Defendants' criminal records; and Findley's toxicology report.

The trial court granted the Defendants' motions to suppress, concluding that Officer Geisel lacked probable cause to arrest the passengers based on Findley's alleged DUI, and that he lacked probable cause to arrest Findley based on his performance on the field sobriety tests. Because the Defendants were improperly detained, the trial court held that Ms. Trexler's consent to search the vehicle was invalid and the evidence uncovered during the stop

must be suppressed as fruit of the poisonous tree.  The Commonwealth timely appealed and it and the trial court complied with Pa. R.A.P. 1925.

## II.

The Commonwealth raises two issues[5] on appeal:  whether the trial court erred by failing to determine whether the Defendants had a reasonable expectation of privacy in the Jeep, and whether it erred in holding that

---

[5] As Findley points out in his brief, the Commonwealth refers only to the trial court's suppression of the AK-47 rifle and does not at any point reference the 9-milimeter pistol or the blood test performed on Findley.  Similarly, the Commonwealth's concise statement references the AK-47 in its first statement of error and the vehicle search generally in its second statement of error. However, the Defendants were each charged with two counts of persons not to possess and carrying a firearm without a license, one for each weapon recovered from the Jeep, and Findley was charged with three counts of DUI based on the results of his blood test.  Because the Commonwealth has not raised any argument on appeal challenging the suppression of Findley's blood test results, we agree that it has waived any claim of error relating to that portion of the trial court's order.  *See* Pa. R.A.P. 1925(b)(4)(vii); ***Commonwealth v. Patterson***, 180 A.3d 1217, 1229 (Pa. Super. 2018) (citation omitted) ("Any claim for which an appellant fails to include citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review is waived.").  However, both firearms were recovered from the same vehicle search and the legal arguments related to suppression of the rifle are identical to the arguments related to suppression of the pistol.  Accordingly, the Commonwealth's claims on appeal regarding the Defendants' expectation of privacy in the Jeep and Ms. Trexler's consent to search the vehicle encompass the recovery of both firearms, and we decline to find waiver simply because the Commonwealth did not specifically identify the pistol in its concise statement and brief as evidence recovered during the challenged search.  *See* Pa. R.A.P. 1925(b)(4)(v) ("Each error identified in the Statement will be deemed to include every subsidiary issue that was raised in the trial court.").

suppression was proper because the search emanated from an illegal seizure of its occupants, notwithstanding Ms. Trexler's consent to search the vehicle.[6]

Here, the Defendants were detained when Officer Geisel removed them from the Jeep, placed them in handcuffs and informed them that they were being detained but were not under arrest. The law governing investigative detentions is well-settled:

> To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion. The asserted grounds for an investigative detention must be evaluated under the totality of the circumstances. So long as the initial detention is lawful, nothing precludes a police officer from acting upon the fortuitous discovery of evidence suggesting a

---

[6]

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. [Where the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Tillery***, 249 A.3d 278, 280 (Pa. Super. 2021) (citation omitted).

different crime than that initially suspected[.] However, an unjustified seizure immediately violates the Fourth Amendment rights of the suspect, taints the evidence recovered thereby, and subjects that evidence to the exclusionary rule.

*Commonwealth v. Brame*, 239 A.3d 1119, 1127-28 (Pa. Super. 2020) (citing *Commonwealth v. Hicks*, 208 A.3d 916, 927-28 (Pa. 2019)). In contrast, a custodial detention that is the functional equivalent of arrest must be supported by probable cause under the totality of the circumstances. *Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009) (citation omitted). "Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Id.*

In the context of a vehicle stop, an officer may conduct "mission related" inquiries into the vehicle violations that prompted the stop and incidental matters concerning the safe operation of the vehicle, such as checking the driver's licensure status, the vehicle's registration and insurance status, or whether there are outstanding warrants against the driver. *Commonwealth v. Malloy*, 257 A.3d 142, 150 (Pa. Super. 2021) (citing *Rodriguez v. U.S.*, 575 U.S. 348, 354 (2015)). An officer may ask whether there are weapons in the vehicle, order the occupants of the vehicle to exit the vehicle for officer safety, or, alternatively, to remain in the vehicle until the stop is completed

without reasonable suspicion of criminal activity. *Id.*; *see also*
***Commonwealth v. Pratt***, 930 A.2d 561, 564 (Pa. Super. 2007).
Importantly, "[t]he authority to carry out these actions do not, in and of
themselves, expand the grounds for detaining or investigating passengers
who are merely present in a lawfully stopped vehicle." *Id.* With this
background, we proceed to the Commonwealth's claims.

**A.**

In its first argument, the Commonwealth contends that the trial court
erred by failing to determine whether the Defendants had a legitimate
expectation of privacy in the Jeep, as they did not own the vehicle or have Ms.
Trexler's permission to use the vehicle. It maintains that a reasonable
expectation of privacy is a threshold requirement to seek suppression of the
firearms found in the vehicle, and the Defendants had none. Relying primarily
on ***Commonwealth v. Shabezz***, 166 A.3d 278 (Pa. 2017), the Defendants
respond that they are not required to establish a reasonable expectation of
privacy because they were illegally detained before the search of the vehicle
took place.[7] We agree.

---

[7] In the trial court, the Defendants argued that they had a reasonable
expectation of privacy in the Jeep and, in the alternative, even if they did not
have such an expectation, they were entitled to challenge the vehicle search
because it resulted from their illegal detention. In its opinion, the trial court
did not squarely address whether the Defendants had a reasonable

It is axiomatic that a defendant seeking suppression of evidence must have standing[8] and a reasonable expectation of privacy in the area searched in order to prevail on the merits of his claim. *See Commonwealth v. Viall*, 890 A.2d 419, 422 (Pa. Super. 2005). "An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable." *Id.* In *Viall*, a case in which no party challenged the legitimacy of the vehicle stop, we held that "an ordinary passenger in an automobile does not by his mere presence have a legitimate expectation of privacy in the entire passenger compartment of that vehicle . . . it would be unreasonable to maintain a subjective expectation of privacy in locations of common access to all occupants." *Id.* at 423; *see also Commonwealth v. Burton*, 973 A.2d

---

expectation of privacy in the Jeep. *See* Trial Court Opinion, 9/2/22, at 5 (stating only that it "agrees with Defendants" and will proceed to the merits analysis). It went on to conclude that the Defendants were subjected to an illegal arrest not supported by probable cause, as discussed *infra*. Based on our review of the certified record and the parties' arguments, we find *Shabezz* dispositive of this issue. "To the extent our legal reasoning differs from the trial court's, we note that as an appellate court, we may affirm on any legal basis supported by the certified record." *Commonwealth v. Williams*, 125 A.3d 425, 433 n.8 (Pa. Super. 2015).

[8] There is no dispute that the Defendants had standing to seek suppression, as they were charged with possessory crimes related to the firearms. *Commonwealth v. Perea*, 791 A.2d 427, 429 (Pa. Super. 2002) ("[U]nder Pennsylvania law, a defendant charged with a possessory offense has standing to challenge a search.").

428, 436 (Pa. Super. 2009) (*en banc*) (finding no reasonable expectation of privacy when the defendant did not own the vehicle and was not authorized by the owner to drive it); **Commonwealth v. Maldonado**, 14 A.3d 907, 911 (Pa. Super. 2011) (same). "Nevertheless, a driver who does not own a vehicle may still establish an expectation of privacy in the vehicle if he can prove he has permission or authority from the owner to drive the vehicle." **Commonwealth v. Peak**, 230 A.3d 1220, 1224 (Pa. Super. 2020).

In **Shabezz**, our Supreme Court held that when a vehicle was stopped without probable cause or reasonable suspicion, the defendant did not need to establish a reasonable expectation of privacy in the vehicle in order to seek suppression of the evidence recovered therein as fruit of the poisonous tree. **Shabezz**, **supra**, at 280. There, officers participating in a narcotics enforcement operation stopped a red Acura on suspicion that the occupants had been involved in a drug transaction. When the vehicle stop was initiated, the defendant fled from the passenger side of the vehicle on foot. He was quickly apprehended and a search of his person and the Acura revealed narcotics, drug paraphernalia and a firearm. **Id.** at 282.

At a suppression hearing, the trial court determined that the police lacked reasonable suspicion or probable cause to stop the vehicle and suppressed all evidence recovered from the defendant and the Acura. On appeal, the Commonwealth contended that because the defendant was a mere

passenger, he did not have a reasonable expectation of privacy in the vehicle and, thus, was not entitled to suppression. *Id.* at 283.

Our Supreme Court held that "evidence derived from an illegal automobile search constitutes fruit of the poisonous tree as a result of the illegal seizure (unless the taint is removed), and that no further demonstration of a privacy interest in the area from which the evidence was seized is required by the Fourth Amendment." *Id.* at 287.

> As noted, we accept here that the seizure was without the requisite level of suspicion. The Commonwealth nonetheless maintains that the illegal seizure does not lead automatically to suppression. The Commonwealth argues that Shabezz must also demonstrate a reasonable expectation of privacy in the areas within which incriminating evidence was found. *The flaw in the Commonwealth's argument is that it assigns no constitutional significance to the illegal seizure, ignoring the fact that the seizure itself was a constitutional violation*. The Commonwealth would require Shabezz to prove two constitutional violations before being entitled to suppression on one. The United States Supreme Court has never endorsed this additional layer of proof as a constitutional prerequisite to relief following an illegal seizure. Nor are we prepared to do so.

*Id.* at 288 (emphasis added). Accordingly, it held that if a seizure is illegal, the Court is then obliged to determine whether any evidence recovered as a result of the illegal seizure is fruit of the poisonous tree. *Id.* at 289. No

- 11 -

further showing of a reasonable expectation of privacy in the vehicle was required.[9]

Applying **Shabezz**, we conclude that the Defendants were not required to establish a reasonable expectation of privacy in the Jeep in order to seek suppression of the evidence therein as fruit of their illegal seizure. At the outset, it is crucial to distinguish between the multiple seizures and searches that occurred in this interaction. The first seizure occurred when Officer Geisel initiated a traffic stop of the Jeep for failure to use headlights, and no party contends that this seizure was illegitimate. The next seizure occurred when Officer Geisel ordered the Defendants to exit the vehicle, placed them in

---

[9] The **Shabezz** Court opined in *dicta* that in a case where the initial vehicle stop was constitutional, a passenger would indeed have to demonstrate a reasonable expectation of privacy in the vehicle in accordance with earlier precedents. **Shabezz**, *supra*, at 290. This statement was not an essential holding of the case. Nevertheless, Pennsylvania courts have repeatedly recognized that all search and seizure cases are fact-specific and must be evaluated under the totality of the circumstances presented, and the nature of a citizen-officer interaction may evolve as the facts develop in any given situation. *See*, *e.g.*, **Commonwealth v. Singletary**, 267 A.3d 1267, 1275-77 (Pa. Super. 2021). In some cases, such as **Shabezz**, a vehicle stop may be entirely unsupported by reasonable suspicion or probable cause, resulting in a different analysis than in a vehicle stop that is well within an officer's authority under the Vehicle Code. In others, as here, what begins as a legitimate vehicle stop may lose that character when the officer steps outside the bounds of what is constitutionally permissible or extends the stop beyond what is necessary to address the violation that initiated it. *See*, *e.g.*, **Malloy**, *supra*.

handcuffs, and ordered them to sit on the curb with their ankles crossed.[10]

These seizures coincided with the first searches in the case, in which Officer

Geisel performed **Terry** frisks of the Defendants that did not yield any

contraband. The final relevant search occurred when Officer Geisel asked Ms.

Trexler for consent to search the Jeep and, on receiving it, uncovered the AK-

47 and pistol from the vehicle. Under this timeline of events, the

Commonwealth's argument that the Defendants must establish a reasonable

expectation of privacy in the vehicle *after* being subject to an illegal arrest is

precisely the argument that our Supreme Court rejected in **Shabezz**.

**Shabezz**, **supra**, at 288 ("The Commonwealth would require Shabezz to

prove two constitutional violations before being entitled to suppression on one.

The United States Supreme Court has never endorsed this additional layer of

---

[10] The trial court first held that Officer Geisel did not have reasonable suspicion to detain the passengers in this way, even if he had such suspicion to investigate Findley's DUI, as Trexler and Hancock were merely passengers not engaged in any behavior indicative of criminal activity. **See** Opinion and Order, 9/2/22, at 6. It further concluded that by handcuffing the Defendants and ordering them to sit on the curb with their ankles crossed, Officer Geisel escalated the encounter to the functional equivalent of arrest, which was not justified with regard to any of the Defendants. **Id.** at 6-7. The Commonwealth does not challenge either of these holdings on appeal; it contends only that the Defendants did not establish a reasonable expectation of privacy in Ms. Trexler's vehicle, and that the trial court erred in declining to make an explicit finding on that issue. Accordingly, for our analysis, we accept the trial court's finding that the detentions outside of the vehicle were arrests unsupported by probable cause.

proof as a constitutional prerequisite to relief following an illegal seizure. Nor are we prepared to do so.").

The Commonwealth distinguishes **Shabezz** with **Commonwealth v. Jackson**, 294 MDA 2021 (Pa. Super. Feb. 8, 2022) (unpublished memorandum).[11] There, the defendant was a passenger in a Volvo that was stopped for a window tint violation. The driver did not have a valid license and on further investigation, officers learned that there was an active arrest warrant for one of the other passengers. The driver consented to a search of the Volvo and officers recovered a firearm and magazine therein. Upon discovering the firearm, Jackson and the driver were handcuffed and the officers informed them that they would both be placed under arrest for conspiracy if no one claimed ownership of the weapon. After receiving **Miranda**[12] warnings, Jackson told the officers that he had purchased the firearm, hidden it in the car without the knowledge of the driver and did not have a license to carry it. **Id.** at *1-2.

Jackson sought suppression of the firearm, magazine and his confession, arguing that the traffic stop was illegal and the evidence was fruit of the poisonous tree. The trial court denied suppression on the basis that the

---

[11] Non-precedential opinions of this Court filed after May 1, 2019, are not binding but may be cited for their persuasive value. Pa. R.A.P. 126(b).

[12] **Miranda v. Arizona**, 384 U.S. 436 (1966).

initial traffic stop was legal. *Id.* at \*2. On appeal, this Court agreed that the stop for the window tint violation was supported by probable cause. *Id.* at \*6. Jackson argued in the alternative that the officers illegally extended the stop past the time necessary to address the window tint violation, rendering the driver's consent to search the vehicle coerced. Relying on *Shabezz*, he argued that this seizure allowed him to seek suppression even though he could not establish a reasonable expectation of privacy in the Volvo.

Upon review, this Court concluded that even though the purpose of the initial stop had concluded, the interaction had evolved over time and the officers had the requisite level of suspicion for each detention and search. *Id.* at \*8 ("For example, what began as an investigative detention may devolve into a mere encounter. . . . Alternatively, what started as a stop supported by probable cause may transform into a continued detention buoyed by reasonable suspicion."). We held that the basis for detaining the occupants of the vehicle evolved based on the window tint, then the non-licensure of the driver and investigation into whether one of the passengers could legally remove the car, the arrest warrant for the other passenger, and finally the valid consent to search given by the driver. *Id.* at \*8-9. As a result, Jackson was not excused from his burden of establishing a reasonable expectation of privacy in the vehicle under *Shabezz*.

Again, multiple searches and seizures took place during the instant interaction between Officer Geisel and the Defendants. Much like the case in *Jackson*, the initial vehicle stop here was supported by probable cause. However, that is where the similarities end—as explained *supra*, we accept the trial court's determination that the Defendants were arrested without probable cause prior to the vehicle search. Ms. Trexler was already at the scene of the traffic stop and had provided vehicle insurance and registration information *before* Officer Geisel removed the Defendants from the vehicle, frisked them and detained them in handcuffs. While Officer Geisel detained the passengers in part to determine Hancock's true identity, any further investigation into that matter was not a "mission related inquiry" incident to the purpose of the traffic stop.[13] *Malloy*, *supra*, at 150. Officer Geisel offered

_____

[13] Officer Geisel did not merely ask the passengers to exit the vehicle for officer safety while he investigated Findley's sobriety. He ordered them out of the vehicle, frisked them, placed them in handcuffs, informed them that they were being detained and ordered them to sit on the curb with their ankles crossed for the remainder of the stop. He repeatedly scolded them for moving their legs as he searched the vehicle and consulted with Detective Deffenbaugh. This detention went far beyond simply asking a passenger to wait outside the vehicle. *See Commonwealth v. Boyd*, 17 A.3d 1274, 1277 (Pa. Super. 2011) (citation omitted) (explaining that during a legal vehicle stop, an officer is entitled to ask occupants to exit the vehicle "as a matter of right"). *Commonwealth v. Palmer*, 145 A.3d 170 (Pa. Super. 2016), cited by the Commonwealth, is instructive in this regard. There, following a lawful vehicle stop, the officer ordered all occupants, including Palmer, to exit the vehicle so it could be towed. *Id.* at 171-72. Based on Palmer's nervous demeanor, repeated reaching toward his pockets, refusal to comply with directions and

no justification for detaining Trexler, who was merely present for the stop, and as explained in note 10, *supra*, the trial court held that Findley was arrested without probable cause prior to undergoing field sobriety testing. In contrast, the **Jackson** Court held that at all times the officers possessed the requisite level of suspicion to detain the vehicle occupants. As the officers here lacked probable cause to arrest the Defendants, **Jackson** is inapposite and any subsequent search flowing from their illegal arrest falls within the **Shabezz** exception if it is fruit of the illegal seizure. The Commonwealth's first issue merits no relief.

**B.**

Next, the Commonwealth contends that the trial court erred in granting suppression because Ms. Trexler, the registered owner of the vehicle, gave valid consent for Officer Geisel to search the Jeep. It argues that Ms. Trexler was not detained at any point or subjected to any coercion or duress before

---

history of firearms offenses, the officer performed a **Terry** frisk for weapons after Palmer exited the vehicle. **Id.** The frisk uncovered bundles of heroin and a firearm. **Id.** at 172. Palmer sought suppression arguing that the traffic stop ended prior to when he was ordered to exit the vehicle, and that the frisk was not supported by reasonable suspicion. We concluded that the traffic stop was ongoing while the officer was arranging for the vehicle to be towed, and Palmer had not argued that the totality of his behavior throughout the stop did not create reasonable suspicion to support the frisk. **Id.** at 173. Thus, the frisk was supported by additional facts amounting to reasonable suspicion and was not performed by rote simply because Palmer was ordered to exit the vehicle. Here, however, the Commonwealth has not challenged the trial court's holding that the Defendants were arrested without probable cause.

consenting to the search. Rather, it contends that Ms. Trexler readily consented to the search after informing Officer Geisel that nothing he would find in the vehicle belonged to her. Thus, even if the detentions of the Defendants were illegal, Ms. Trexler's consent was sufficiently independent to remove any taint and the firearms seized from the Jeep were not fruit of the poisonous tree.

For consent to search to be constitutionally valid, it must be given intelligently and voluntarily. "For a finding of voluntariness, the Commonwealth must establish that the consent given by the defendant is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Commonwealth v. Valdivia*, 195 A.3d 855, 862 (Pa. 2018) (quotations & citation omitted). In assessing the voluntariness of consent to search, we consider the following factors:

> (1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search.

*Commonwealth v. Hawkins*, 257 A.3d 1, 10 (Pa. Super. 2020) (citation omitted).

Additionally, we note that "[e]vidence constitutes fruit of the poisonous tree, and must be suppressed, if it was obtained by 'exploitation' of the illegality [of the police's conduct] and so long as the taint of that illegality has not been purged." **Shabezz**, **supra**, at 290 (quoting **Wong Sun v. U.S.**, 371 U.S. 471, 486 (1963)). Taint can be removed from an illegal seizure through circumstances such as attenuation, inevitable discovery, independent source or intervening acts and events. **Id.** "The question of whether evidence is the 'fruit' of illegal police conduct is resolved by determining whether, assuming the primary illegality has been established, the challenged evidence has been obtained by exploitation of that illegality, or instead, by means sufficiently distinguishable to be purged of the taint of the primary illegality." **Commonwealth v. Santiago**, 209 A.3d 912, 924 (Pa. 2019).

In holding that Ms. Trexler's consent was not voluntary, the trial court relied on **Commonwealth v. Helm**, 690 A.2d 739 (Pa. Super. 1997), and **Commonwealth v. Pless**, 679 A.2d 232 (Pa. Super. 1996), for the proposition that once an individual has been detained without reasonable suspicion or probable cause, their consent to search is involuntary. Thus, it held that the firearms were the fruit of the poisonous tree emanating from the unlawful arrest of the Defendants. While the trial court acknowledged that it was not Ms. Trexler who was detained without cause but rather the Defendants, it found this distinction to be inconsequential. **See** Opinion and

Order, 9/2/22, at 7 ("While those cases are distinguishable in that they involve consent given by the individual being improperly detained, as opposed to a third party with authority to provide consent to search a vehicle, their holdings are still applicable here because their primary concern is not the voluntariness of the consent given, but the taint on the evidence gathered due to the illegal detention."). Similarly, the Defendants rely principally on ***Commonwealth v. McClease***, 750 A.2 320 (Pa. Super. 2000), and ***Commonwealth v. Newton***, 943 A.2d 278 (Pa. Super. 2007), to emphasize that consent to search obtained after a person has been unlawfully detained cannot be considered voluntary and uncoerced.

We disagree, as the difference between Ms. Trexler's position as an observer of the stop and the Defendants' as detainees has a material effect on the voluntariness of her consent to the search. Ms. Trexler was simply not subjected to the coercive power of an illegal arrest prior to giving consent to the search. The cases cited by the trial court and the Defendants do not compel the conclusion that any individual who witnesses an illegal arrest is unable to give voluntary consent to a search.

The video of the traffic stop reveals the following. After he detained the Defendants in handcuffs, Officer Geisel confirmed that Detective Deffenbaugh, who was on scene assisting, had smelled marijuana in the vehicle and opened the Jeep's passenger-side doors and looked into their interior pockets. Before

continuing to search the interior, Officer Geisel said, "well, I'm gonna ask the owner of the vehicle. Do you mind if I search your vehicle?" Commonwealth Exhibit 2, 4:16:15-32. As he asked the question, he walked toward Ms. Trexler, who was seated next to Detective Deffenbaugh's vehicle approximately 15 feet down the sidewalk and apart from the defendants.[14] She asked, "Do I have to?" and before he could respond, went on to state, "I mean, nothing in there is mine." *Id.*, 4:16:32-37. Officer Geisel said that he was asking for verbal consent to search and Ms. Trexler reiterated that nothing in the vehicle belonged to her. Officer Geisel said, "well, you're the owner of the vehicle, you weren't in operation of it and you weren't in control of it so I'm not going to blame you for what they've possibly put in your vehicle, okay." *Id.*, 4:16:42-51. He again asked for verbal consent to search, and Ms. Trexler assented. Officer Geisel then searched the vehicle and uncovered the firearms.[15] He did not tell Ms. Trexler that she was free to refuse the search or ask her to sign a written consent form explaining her rights.

The Defendants' argument, in essence, overrides Ms. Trexler's autonomy. There is no dispute that the lawful, registered owner of a vehicle can consent to its search, and no party has argued that Ms. Trexler was

---

[14] At this point, Ms. Trexler had been on the scene for approximately 15 minutes.

[15] Ms. Trexler did not testify at the suppression hearing.

subject to an investigative detention at the time she gave consent to the search. In the cases cited by the trial court and the Defendants, consent was determined to be coerced because of the inherent pressure associated with the illegal detention of the defendants—in other words, someone who is subject to illegal detention is far less likely to feel empowered to decline consent to search. Here, however, Ms. Trexler was not detained. She voluntarily appeared at the scene of the traffic stop after Trexler called her on the phone, brought insurance information for the Jeep, and explained that she had recently purchased the vehicle and had registered it at the time of purchase. She spoke freely with Officer Geisel before the Defendants were placed under arrest. While she could view Officer Geisel and Detective Deffenbaugh as they removed the Defendants from the Jeep and placed them under arrest, she was by no means similarly situated to the Defendants. To the contrary, she provided consent only after being assured by Officer Geisel that she would not be held responsible for anything uncovered in the vehicle.

Turning to the factors set forth in **Hawkins**, **supra**, Ms. Trexler was not subject to any police excesses or physical contact, and Officer Geisel and Detective Deffenbaugh's demeanors when interacting with her on the scene were respectful as they attempted to resolve the registration and insurance questions. They directed her movement to a minimal extent, asking her to stay away from the Defendants and the vehicle while they continued to

investigate. She arrived freely at the scene and was not placed in handcuffs, frisked or physically restrained. While Officer Geisel did not directly inform her that she could refuse the search, he did assure her that she would not be criminally charged for anything found in the Jeep.[16] She did not express any reservations after being assured that she would not be held responsible for the Jeep's contents. Based on the totality of these circumstances, we conclude that Ms. Trexler freely and voluntarily consented to the search of the vehicle and her consent was sufficiently independent of the Defendants' illegal arrests to remove any associated taint from the evidence. Accordingly, we reverse the order of the trial court and remand for further proceedings.

Order reversed. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

---

[16] Even though Ms. Trexler asked if she had to give consent to search, she immediately went on to say that nothing in the vehicle belonged to her. It appears from the video that Officer Geisel did not respond to the question merely because Ms. Trexler did not give him the opportunity. Commonwealth Exhibit 2, 4:16:32-37.

J-A11037-23
J-A11038-23
J-A11039-23


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  6/9/2023